**UNITED STATES of America, Plaintiff–Appellee,**

v.

**David Allen BATES; Ricky Lee Archer, Defendants–Appellants.**

**No. 90–10127.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 16, 1990.

Decided Oct. 22, 1990.

As Amended Jan. 2, 1991.

E. Marshall Hodgkins, Fresno, Cal., for defendant-appellant Rick Lee Archer.

Tommy Hawk, Asst. U.S. Atty., Fresno, Cal., for plaintiff-appellee.

Before CHOY and FLETCHER, Circuit Judges, and FITZGERALD,\* District Judge.

FLETCHER, Circuit Judge:

Ricky Lee Archer and David Allen Bates appeal the district court's denial of a motion to dismiss indictments charging them with armed robbery. Their initial trial ended when the district court sua sponte declared a mistrial. They allege that retrial would violate the fifth amendment double jeopardy clause. We agree with defendants and reverse.

## FACTS

Archer's and Bates's charges arise from two Modesto bank robberies. The first occurred at Guarantee Savings & Loan on November 18, 1988; the second, at First Interstate Bank, on November 28, 1988. Archer and Bates each were charged with two counts of armed robbery, two counts of using a gun while committing robbery, and one count of being a felon in possession of a firearm.

The government presented much evidence pointing to the defendants as the robbers. Several witnesses identified them from surveillance photos and in person. Other witnesses linked them to the gun and car used in the robberies. The car's owner, who knew Archer, testified that her car had been stolen. The car was not registered to her, however, and the court struck the testimony of three witnesses who connected her to the car's license number.

Mark W. Coleman, Asst. Federal Public Defender, Fresno, Cal., for defendant-appellant David Allen Bates.

\* Honorable James M. Fitzgerald, Senior United States District Judge for the District of Alaska, sitting by designation.

On December 8, 1988, before the defendants were arrested, San Joaquin County Deputy Sheriff Francine Silva attempted to stop an automobile, later suspected to contain the defendants, for speeding. The car led her on a high-speed chase, and a passenger shot at her with a chrome 9mm handgun later discovered to match the gun used in the bank robberies. The government sought to introduce, under Fed.R. Evid. 404(b), evidence of the shooting to show consciousness of guilt, knowledge, and identity and of the gun, slugs, and casings to show *modus operandi*, identity, opportunity, plan, and preparation.

After a hearing in limine, the judge ruled that the evidence would be admissible if the government laid a proper foundation. The court stated in its memorandum decision,

> [T]here must be positive evidence tying the 9mm gun in question to the defendants during the November 1988 robberies in Stanislaus County. Further, there must be evidence that the defendants were the persons in the car being chased. In other words, the gun, the slugs and the casings cannot be used to establish the identity of the persons in the car being chased.

Memorandum Decision, *United States v. Bates*, CR No. 89–068 EDP, at 3 (E.D.Cal. Dec. 8, 1989).[1] During the trial, before Silva testified on December 15, the parties discussed the testimony again. The defense attorneys again objected to admitting the evidence. The prosecuting attorney requested that the court first hear the testimony outside the jury's presence "for the purposes of assuaging the concerns of the defense counsel." The court responded, "Absolutely not.... [I]f I rule against you or rule for you after you lay the appropriate foundation, that doesn't effect a mistrial...." Reporter's Partial Transcript, Conference, at 6 (Dec. 15, 1989).

After this hearing but before Silva testified, the prosecutor discussed the matter with Archer's lawyer. The prosecutor assured him "that he had no intention of eliciting testimony regarding the shooting, let alone the gun, slug or casings that linked Archer to the robberies, unless and until Deputy Silva identified defendants from the stand." Declaration of [the prosecutor] re: Mistrial (Dec. 18, 1989).

Silva testified that while patrolling on December 8, 1988, she attempted to pull over a speeding car, which failed to stop. She caught up with the car and saw that two people were in it. When the car made a U-turn, she was within ten feet of them and got a good look at their faces. In a declaration to the court, the prosecutor says that Silva could have testified to the fact that some shooting took place at this point but that he asked no questions about it and Silva said nothing about it. Silva testified that she continued pursuing the car for about five miles. The following interchange then took place.

> [THE PROSECUTOR]: And describe what happened in your pursuit during that five miles.
>
> [SILVA]: During that five miles, the passenger of the vehicle began firing at me.
>
> THE COURT: All right, ladies and gentlemen, I declare this to be a mistrial. I warned [the prosecutor] in a written order prior to this trial that before this evidence would be received that he would have to lay a foundation by identifying these defendants as being the occupants of that vehicle. I can only conclude that his activity here this afternoon was deliberate, that it was contemptuous and that it's an insult to the Court.
>
> You are now excused. I apologize for imposing upon your pre-Christmas activities and I order this matter back on calendar to be reset next Monday at 2:00 o'clock.
>
> THE PROSECUTOR: Your Honor, if I may say for the record—
>
> THE COURT: You can say anything you want in writing ... I don't want to hear from you again.

---

1. Further citations to documents in the record will refer only to the document's title and the date.

[ARCHER'S COUNSEL]: Your Honor, may I address the court out of the presence of the jury?

Reporter's Partial Transcript, Testimony of Fran Silva, at 8–9 (Dec. 15, 1989). The proceedings were immediately adjourned.

About two minutes later, the government requested an *in camera* hearing on the mistrial ruling. The court sent a message to the government to put it in writing. About 15 minutes later, the government submitted a letter informing the court that Silva could identify the defendants as the speeding car occupants and that her testimony therefore would not prejudice the defendants. The government asked that the court reconvene to hear this testimony and that the judge reconsider the mistrial ruling. The court did not respond.

Immediately prior to the next hearing on December 18, scheduled by the court to reset the case for trial, the defendants moved in writing for dismissal on double jeopardy grounds.[2] At the hearing itself, counsel informed the court of the motion because they did not want a failure to do so to be construed as a waiver of defendants' rights against double jeopardy.

The same day, the government filed the prosecutor's declaration on the facts surrounding the mistrial. The prosecutor noted his pretestimony belief that Silva could identify the defendants, his offer to examine Silva out of the jury's presence, his discussion with defense counsel, Silva's restraint from mentioning the first gunfire exchange, Silva's assurances after the testimony that she could identify the defendants as the speeding car occupants, and his efforts to correct the error. The prosecutor also explained that he had specifically instructed Silva not to mention the shooting until after she had identified Bates and Archer, that "she should discuss the incident as if it were a simple car chase." The prosecutor reported that Silva indicated that she understood. The prosecutor also stated that he did not understand the court's order to require him necessarily to

have Silva identify the defendants before testifying about the shooting but that he took the extra precaution of instructing her to do so. The prosecutor concluded that Silva mentioned the shooting because she apparently misunderstood one of his questions.[3] The prosecutor assured the court that he "did not purposely or contemptuously disobey" the court's order, that he "earnestly attempted to comply" with it, that he "did not intentionally provoke, seek or want a mistrial."

At the hearing on the motion, defense counsel stated that they had asked to speak to the judge immediately after the mistrial was declared in order to object to the mistrial. Defense counsel reiterated that they had filed their motion to dismiss and stated their objection on the record at the December 18 hearing to ensure that the court knew they objected. After defense counsel argued that implied consent could not be found and the prosecutor had partially responded to that contention, the court stated,

> Just a moment ... I would say this for the record right now and you are stuck with it. I never gave them any opportunity because you were so manifestly deliberately disobeying the Court's order that I felt you needed to be punished, so you can forget about implied consent.

Reporter's Transcript of Hearing on Motion to Dismiss at 11 (Jan. 8, 1990); *see also id.* at 14 ("I made it clear that I don't believe that you had a chance to object to a mistrial and that will be the basis of my decision on that issue."). The prosecutor moved on to the prosecutorial error issue and again insisted that he had not intentionally caused the mistrial. The court responded, "Then you are one of the most incompetent attorneys that's ever been in this courtroom." *Id.* at 11–12.

The court denied the motion to dismiss. It found that the court initiated the mistrial and that defendants did not consent to it— "neither the prosecution nor defense counsel was given an opportunity to comment on the propriety of the mistrial." Memo-

---

**2.** December 18, a Monday, was the next court business day after the mistrial was declared on December 15, a Friday.

**3.** Silva's declaration confirms this interpretation. Declaration of Francine Silva at 1 (Dec. 22, 1989).

randum Decision re: Defendants' Motion to Dismiss Based on the Double Jeopardy Clause of the Constitution at 1 & n. 1 (Feb. 23, 1990); *see also id.* at 4 (counsel for both sides sought to address the court, but the court precluded it). The court stated that the prosecutor did not ask Silva to identify the defendants at what appeared to be the "logical point," when she was within ten feet of them. The court declared that it had to make an "instant decision" about whether "the possible bias created by the testimony of the witness Silva [could] be erased by a continuing instruction." *Id.* at 5. The court concluded that it could not. Defendants appealed.[4]

## JURISDICTION

■ We have jurisdiction to hear an interlocutory appeal from a denial of a motion to dismiss on double jeopardy grounds under 28 U.S.C. § 1291. *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977); *United States v. Goland,* 897 F.2d 405, 408 (9th Cir.1990).

## STANDARD OF REVIEW

We review *de novo* a district court's denial of a motion to dismiss the indictment on double jeopardy grounds. *Id.*

## DISCUSSION

### I.

■ Criminal defendants have a right to have the jury first impaneled to try them reach a verdict. *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949). This right is not absolute, however, and must at times be subordinated to society's interest in just determinations of guilt or innocence. *Id.*

■ Different standards apply to mistrials depending upon the defendant's position. A defendant's request for the mis-

trial bars retrial only when the prosecutor goads the defendant into making the request, when the prosecutor intends "to subvert the protections afforded by the Double Jeopardy Clause." *Oregon v. Kennedy,* 456 U.S. 667, 675–76, 102 S.Ct. 2083, 2089, 72 L.Ed.2d 416 (1982). Neither the defendants nor the court argue that the prosecutor is guilty of the conduct *Kennedy* proscribes.[5]

The government does claim that the defendants impliedly consented to the mistrial. In its view, Bates and Archer did not complain when the trial court declared the mistrial and should not be allowed to complain now. Defendants disagree, asserting they were given no opportunity to object to the mistrial. If they did not consent, only "manifest necessity" justifying the mistrial permits retrial. *Arizona v. Washington,* 434 U.S. 497, 505, 98 S.Ct. 824, 830, 54 L.Ed.2d 717 (1978). In a case where the mistrial occurred without the defendant's consent (after a hung jury), Justice Story wrote the classic lines setting forth the principle.

> [T]he law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes.... But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound and conscientious exercise of this discretion, rests, in this, as in other cases, upon the

---

**4.** Bates and Archer are in custody serving 25– and 20–year sentences, respectively, for unrelated convictions. Arrest warrants issued for parole violations are also outstanding against them, although the parties have not informed us of any action taken on these charges.

**5.** Defendants do emphasize the court's finding that the prosecutor's acts were deliberate and intentional. The court never found, however, that the prosecutor intended to cause a mistrial (as opposed to intending to disobey the court's order to gain an advantage), and defendants do not assert that he did.

responsibility of the judges, under their oaths of office.

*United States v. Perez*, 22 U.S. (Wheat. 9) 579, 580, 6 L.Ed. 165 (1824). Central among the protections afforded by the double jeopardy clause is the assurance that "the defendant retain primary control over the course to be followed in the event of [judicial or prosecutorial] error." *United States v. Dinitz*, 424 U.S. 600, 609, 96 S.Ct. 1075, 1080, 47 L.Ed.2d 267 (1976). Therefore, when the defendant does not consent to the mistrial, reviewing courts more strictly scrutinize the justifications advanced.

### A. *Consent*

■ The defendants claim that the district court correctly found that the defendants did not impliedly consent to the mistrial because they had no opportunity to do so. Counsel immediately requested to talk to the judge outside the jury's presence but did not say why.[6] They now assert that their purpose was to object to the mistrial. The judge did not grant their request for a hearing; he did not even answer.[7] The trial court is in the best position to determine whether defendants had the opportunity to object under these circumstances. It did not clearly err in concluding that they did not.

*Lovinger v. Circuit Court*, 845 F.2d 739 (7th Cir.), *cert. denied*, 488 U.S. 851, 109 S.Ct. 136, 102 L.Ed.2d 108 (1988), is similar to this case. The parties in *Lovinger* were totally surprised when the judge came back after a recess, spoke about several errors

that had occurred during the trial, and declared a mistrial. He left the courtroom as he was finishing his statement. *Id.* at 742. The Seventh Circuit found that Lovinger did not consent. He had no opportunity to object after the court's mistrial statement; he did object at his earliest opportunity, ten days later when he was brought before another judge for retrial. *See also United States v. Jorn*, 400 U.S. 470, 487, 91 S.Ct. 547, 558, 27 L.Ed.2d 543 (1971) (plurality opinion) (no consent where no opportunity to object to *sua sponte* mistrial); *Gori v. United States*, 367 U.S. 364, 365 n. 6, 81 S.Ct. 1523, 1524 n. 6, 6 L.Ed.2d 901 (1961) (noting in dicta petitioner's argument that there was no opportunity to object "because of the precipitous course of events"); *cf. United States v. Puleo*, 817 F.2d 702, 705 (11th Cir.) (implied consent where no objection made although trial judge expressed intent to declare mistrial if jury came back deadlocked again), *cert. denied*, 484 U.S. 978, 108 S.Ct. 491, 98 L.Ed.2d 489 (1987); *United States v. Smith*, 621 F.2d 350, 352 (9th Cir.1980) (implied consent where, after court declared mistrial *sua sponte*, defense counsel did not object but engaged in planning for new trial); *United States v. Beckerman*, 516 F.2d 905, 909 n. 8 (2d Cir.1975) (implied consent where defendant could have objected to jury discharge when court gave him opportunity to address another issue). Because Bates and Archer had no opportunity to object, we will not infer that they consented to the mistrial.[8]

---

6. To give reasons in front of the jury might itself have created grounds for a mistrial, something we would not expect an attorney objecting to a mistrial to do.

7. This request is the last line of the transcript. That fact considered together with the judge's abruptness in the preceding lines indicates that the judge was proceeding off the bench when the request was made.

8. The dissent would require defendants to express aloud their desire to have continued with the trial when making their double jeopardy objection after the mistrial, even if they had no opportunity to do so before the mistrial was declared. As the law currently stands, once the mistrial is declared without a defendant's consent, there is no such formalistic requirement.

Without a defendant's consent, the relevant inquiry is whether manifest necessity justified the mistrial, not whether the defendant wanted to continue with the trial. As a practical matter, it would be pointless to require defendants to recite their desire to have continued with the trial. The jury has been discharged; any semblance of control is out of the defendants' hands; granting the request to continue is impossible. Factually, also, the dissent indicates that the defendants expressed no desire to have continued with the trial when making their post-mistrial double jeopardy claim. In their motion to dismiss, however, the defendants quoted the law on their right to have their trial completed. They also asserted that the mistrial deprived them of a promising opportunity to impeach government witnesses.

## B. *Manifest Necessity*

Just as Justice Story found it impossible to describe all the circumstances that would constitute manifest necessity, courts steadfastly continue to refuse to categorize fact patterns that constitute manifest necessity and fact patterns that do not. *Jorn*, 400 U.S. at 480, 91 S.Ct. at 554.[9] There are degrees of necessity, and only a "high" degree can justify a mistrial. *Washington*, 434 U.S. at 506, 98 S.Ct. at 830. Reviewing courts should respect the setting in which the trial judge finds herself. *Id.* at 505–06, 98 S.Ct. at 830. Substantial deference is due the district court, but the degree of deference varies according to the circumstances of each case. *Thomas v. Municipal Court*, 878 F.2d 285, 287 (9th Cir.1989); *United States v. Shaw*, 829 F.2d 714, 719 (9th Cir.1987), *cert. denied*, 485 U.S. 1022, 108 S.Ct. 1577, 99 L.Ed.2d 892 (1988); *United States v. Sanders*, 591 F.2d 1293, 1296 (9th Cir.1979).

■ The reviewing court owes great deference to the trial court when it declares a mistrial because of juror bias, *Washington*, 434 U.S. at 511, 98 S.Ct. at 833; *Gori*, 367 U.S. at 366, 81 S.Ct. at 1525; *Sanders*, 591 F.2d at 1297, or acts to protect the defendant's rights, *Gori*, 367 U.S. at 366, 81 S.Ct. at 1525. The facts in *Gori* as described in the Second Circuit's opinion are similar to those in this case. *See United States v. Gori*, 282 F.2d 43, 44–46 & n. 3 (2d Cir.1960). The trial court suddenly declared a mistrial during the government's direct examination of a witness. The Second Circuit found that the prosecutor had done nothing to "instigate" the mistrial declaration. The parties agreed that the judge declared the mistrial "to prevent the prosecutor from bringing out evidence of other crimes by the accused." The court stated that the trial judge still should have waited for the prosecutor to do something improper before declaring a mistrial.

*Gori*, 367 U.S. at 366 n. 7, 81 S.Ct. at 1525 n. 7 (quoting 282 F.2d at 46).

The Supreme Court understood the Second Circuit as finding that the mistrial was "neither apparently justified nor clearly erroneous." 367 U.S. at 367, 81 S.Ct. at 1525. The Court agreed that the trial judge displayed "an overeager solicitude ... in favor of the accused" but cautioned against second-guessing the trial judge on a cold record. *Id.* at 366–67, 81 S.Ct. at 1525. It noted that it had "consistently declined to scrutinize with sharp surveillance the exercise of [the trial court's] discretion" and stated,

> Where, for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared without the defendant's consent and even over his objection, and he may be retried consistently with the Fifth Amendment.

*Id.* at 368, 81 S.Ct. at 1526.

Although *Gori* gave the trial judge very broad latitude, *Perez* early established that the judge must exercise sound discretion in declaring a mistrial. 22 U.S. at 579. The Court in *Jorn* emphasized that *Gori* did not relieve the district court of the obligation to exercise sound discretion or the reviewing court of its obligation to determine whether the trial court exercised sound discretion.

> [E]ven in circumstances where the problem reflects error on the part of one counsel or the other, the trial judge must still take care to assure himself that the situation warrants action on his part foreclosing the defendant from a potentially favorable judgment by the tribunal....
>
> ... [I]n the final analysis, the judge must always temper the decision whether or not to abort the trial by considering

---

9. A plurality of the justices joined in the "lead" opinion in *Jorn*. Two who did not, Justices Black and Brennan, believed that the Court lacked jurisdiction over the appeal because the trial judge, by declaring a mistrial, had essentially acquitted the defendant on the facts of the case. They therefore believed that the trial court had no discretion to put the defendant in jeopardy again, leaving the Court without jurisdiction as well. In light of a majority's decision to reach the merits, however, they joined the judgment of the Court. 400 U.S. at 488, 91 S.Ct. at 558 (Black, J., and Brennan, J., concurring in the judgment).

the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate.

*Jorn,* 400 U.S. at 486, 91 S.Ct. at 558;[10] *see also Washington,* 434 U.S. at 514, 98 S.Ct. at 835 ("reviewing courts have the obligation to satisfy themselves that ... the trial judge exercised 'sound discretion' in declaring a mistrial"); *see also Thomas,* 878 F.2d at 288; *Shaw,* 829 F.2d at 719; *Sanders,* 591 F.2d at 1297. Our circuit has added,

> When the record is barren of reasons for the mistrial, or discloses that the judge's assumptions regarding jury deadlock or juror bias were unfounded, or reveals that the judge failed adequately to consider feasible alternatives to a mistrial, then the decision to declare a mistrial may be reversed by a reviewing court, despite the high degree of deference to be accorded the conclusions of the trial judge in such cases.

*Id.* at 1229 (citations omitted). The reviewing court cannot condone irrational or irresponsible behavior by the trial judge. *Washington,* 434 U.S. at 514, 98 S.Ct. at 834; *Thomas,* 878 F.2d at 288.

■■■ When an error certain to result in reversal occurs, a trial court properly exercises its discretion in declaring a mistrial. As the Supreme Court explained in *Illinois v. Somerville,* 410 U.S. 458, 464, 93 S.Ct. 1066, 1070, 35 L.Ed.2d 425 (1973):

> A trial judge properly exercises his discretion to declare a mistrial if an impar-

tial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial. If an error would make reversal on appeal a certainty, it would not "serve the ends of justice" to require that the Government proceed with its proof when, if it succeeded before the jury, it would automatically be stripped of that success by an appellate court.

Requiring completion of the trial and reversal on appeal as the price for retrial does not advance the policy underlying the double jeopardy clause. At the same time, permitting retrial when no reversible error has occurred at the time of the mistrial defeats the purposes of the clause. *See Sanders,* 591 F.2d at 1299. Ideally the defendant is subjected to one fair trial before one jury. Determining that a mistrial was proper and retrial permissible because reversal was certain is an objective, not subjective, inquiry to be based on the record as it existed at the time of the mistrial. The trial judge's subjective belief that reversal would occur does not justify a mistrial when the error is not one that would clearly lead to reversal.

■ When it is not patently clear that reversal is certain, the reviewing court must scrutinize the record, since the Supreme Court requires the courts of appeal to ascertain that the trial court exercised its discretion properly in the circumstances that confronted it. The Supreme Court and appellate courts have relied on four indicators in determining whether the trial court

---

**10.** The dissent argues that the decision in *Jorn,* as a mere plurality, cannot overcome the teaching of *Gori.* The dissent overlooks the fact that Justices Black and Brennan concurred with Justice Harlan's plurality opinion on the precise issue before us. Their disagreement with the other members of the Court was whether the Court had jurisdiction to reach the issue. The three dissenters in *Jorn* disagreed explicitly on the issue of whether "the constitutional guarantee against double jeopardy categorically operates to forestall a trial of the case on the merits." *Jorn,* 400 U.S. at 488, 91 S.Ct. at 558–59 (dissenting opinion). The dissent in our case relies on the *Jorn* dissent's interpretation of *Gori* rather than that of the *Jorn* majority on the critical issue before us.

More important, however, is a point that should not be overlooked: the Court in *Jorn* and *Gori* agreed that a trial court can abuse its discretion in granting a mistrial and that the remedy for abuse is protecting the defendant from retrial. The Court has never waivered on this point. *See Washington,* 434 U.S. at 497, 98 S.Ct. at 824; *Illinois v. Somerville,* 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). The *Gori* Court permitted retrial because the Court concluded there had been no abuse of discretion. Any differences between *Jorn* and *Gori* are unimportant to our determination once the dissent concedes, as it does, that the trial judge did abuse his discretion in granting Bates's and Archer's mistrials.

abused its discretion. Has the trial judge (1) heard the opinions of the parties about the propriety of the mistrial, (2) considered the alternatives to a mistrial and chosen the alternative least harmful to a defendant's rights, (3) acted deliberately instead of abruptly, and (4) properly determined that the defendant would benefit from the declaration of mistrial?

(1) *Hearing from the parties.* Reviewing courts have found that trial courts are much more likely to have exercised sound discretion when they listen to the parties before declaring a mistrial and dismissing the jury. The Supreme Court declined to find abuse where the trial judge in *Washington* "gave both defense counsel and the prosecutor full opportunity to explain their positions on the propriety of a mistrial." 434 U.S. at 515–16 & n. 34, 98 S.Ct. at 835 & n. 34. In *United States v. Klein,* the Second Circuit praised the trial judge's asking counsel for suggested alternatives. 582 F.2d 186, 195 (2d Cir.1978). In contrast, the Supreme Court and the Seventh Circuit found the trial judges abused their discretion in *Jorn,* 400 U.S. at 487, 91 S.Ct. at 558, and *Lovinger,* 845 F.2d at 744, where the judges did not give the parties an opportunity to speak. Likewise, even though the *Sanders* judge had considered a motion for continuance, our circuit disapproved of his "allow[ing] no opportunity for argument from either side on the need for a mistrial." 591 F.2d at 1298.

(2) *Considering the alternatives.* A trial court should consider and correctly evaluate the alternatives to a mistrial. In *Jorn,* the trial court's failure to consider the possibility of a trial continuance was a factor that influenced the Supreme Court's finding that the court had abused its discretion. 400 U.S. at 487, 91 S.Ct. at 558. Our circuit in holding in *Smith* that no manifest necessity justified the mistrial weighed heavily the fact that the trial court did not

consider the alternative of a continuance. 621 F.2d at 351 (holding, however, that defendant had impliedly consented to the mistrial); *see also Grandberry v. Bonner,* 653 F.2d 1010, 1015–16 (5th Cir.1981) (no consideration of alternatives to mistrial when sequestered juror needed his blood pressure pills). On the other hand, our circuit considered it favorable in *Sanders* that the judge considered a motion for continuance, although it still found the judge had abused his discretion. 591 F.2d at 1298. We decided in *Shaw* that retrial was not barred because the trial court correctly evaluated the alternatives to mistrial. In opening argument, defense counsel summarized, favorably to the defendant, the testimony of a prospective prosecution witness. The witness refused to testify. The trial court found that neither an instruction to disregard the argument nor introduction of the witness's grand jury testimony could cure the prejudice. 621 F.2d at 351; *see also Klein,* 582 F.2d at 195 (court expressly considered alternatives to mistrial). Finally, once the court considers the alternatives, it should adopt one if less drastic and less harmful to the defendant's rights than a mistrial. *See Mizell v. Attorney General,* 586 F.2d 942, 947 (2d Cir.1978) (inconvenience to jury from two-day continuance did not justify mistrial); *Dunkerley v. Hogan,* 579 F.2d 141, 148 (2d Cir.1978) (mistrial not justified when continuance was available).

(3) *Deliberate instead of abrupt action.* A trial court's abrupt declaration of a mistrial suggests that it failed to exercise sound discretion. "A precipitate decision, reflected by a rapid sequence of events culminating in a declaration of mistrial, would tend to indicate insufficient concern for the defendant's constitutional protection."[11] *Brady v. Samaha,* 667 F.2d 224, 229 (1st Cir.1981). In *Washington,* the Court found the judge had exercised sound discretion, noting approvingly that the trial

---

**11.** When a trial court hears from the parties and considers the alternatives to a mistrial it is more likely to act deliberately rather than abruptly; the courts nonetheless have noted the abruptness element as a separate factor. The suddenness of the court's action does appear to have independent significance. Fast-moving events, even if they include the parties arguing their positions and the court having in mind alternatives, may preclude adequate reflection on the issues by the parties and the court and result in a premature decision if the court does not take time out to reflect on its options.

judge did not act "precipitately" in responding to the prosecutor's mistrial request. 434 U.S. at 515, 98 S.Ct. at 835; *see also Cherry v. Director, State Bd. of Corrections*, 635 F.2d 414, 418 (5th Cir.1981) (mistrial decision reached "after inquiry and overnight deliberation"); *Klein*, 582 F.2d at 195 (judge took great care to avoid a premature mistrial declaration). By way of contrast, the trial court in *Jorn* acted "abruptly." 400 U.S. at 486, 91 S.Ct. at 557 (abuse found); *see also Lovinger*, 845 F.2d at 745 ("the trial judge took the kind of abrupt and precipitate action which is inconsistent with the exercise of sound discretion"); *Grandberry*, 653 F.2d at 1015–16 ("abrupt and precipitate action"); *Sanders*, 591 F.2d at 1298 (no "responsible and deliberate consideration ... which constitutes the exercise of sound discretion").

(4) *Benefit to defendant.* A mistrial granted to benefit the defendant is favored. *See Gori*, 367 U.S. at 369, 81 S.Ct. at 1526 ("we are unwilling, where it clearly appears that a mistrial has been granted in the sole interest of the defendant, to hold that its necessary consequence is to bar all retrial"). Reviewing courts should be careful not to use hindsight to second-guess a trial court's conclusion that a mistrial was important to protect a defendant's rights, *Jorn*, 400 U.S. at 483, 91 S.Ct. at 556, but reviewing courts should not lose sight of the importance of letting defendants make their own choices about the course of the trial and what benefits them.

In *Lovinger,* the Seventh Circuit addressed whether the mistrial helped the defendant. When the trial court declared the mistrial, the trial was going badly for the prosecutor; his case was falling apart. The court of appeals noted that "[t]he defendant might well be pleased with this result and, far from desiring a mistrial, might wish to proceed to a verdict before the first tribunal." 845 F.2d at 744 (defendant had no opportunity to object). In *Sanders,* our circuit took care to evaluate how the mistrial affected the defendant's

case. The trial court had declared a mistrial when an expected witness refused to testify. The defense had planned to attack her and other witnesses' credibility. We found that, given that intention, the defendant "more likely ... would have benefited rather than suffered from the 'tainted' testimony." 591 F.2d at 1298. In contrast, the reviewing court found the mistrial aided the defendant in *United States v. Cyphers*, 553 F.2d 1064, 1068 (7th Cir.1977) (additionally, his own mistrial request provoked the mistrial ruling).

## II.

■ We have reviewed the record[12] in this case in light of the four identified factors. First, the court did not let the parties comment, despite their requests. The prosecutor's Olympian efforts to bend the judge's ear were to no avail.

The judge did not explore the most important alternative, allowing the trial to proceed if Silva in fact could identify the speeding car occupants as the defendants. There would have been no reversible error at all if Silva had been permitted to complete her testimony, including identifying the defendants. Although the court considered and rejected a correcting instruction, Silva's identification would have made this alternative unnecessary. The judge also did not excuse the jury from the courtroom temporarily to give him time to consult and think and deal with the perceived error. The judge had rejected another feasible alternative before the problem had ever become manifest: he refused to allow Silva to testify initially out of the jury's presence, saying, ironically, that error would not provoke a mistrial.

The third factor also points to abuse. Even though the trial judge states in his disposition that he decided before declaring the mistrial that an instruction could not remedy the prosecutor's error, the court acted instantaneously, not deliberately.

---

12. We must look to the record of the trial itself. The Constitution does not require the trial judge to consider the alternatives on the record or conduct a hearing, *United States v. Jaramillo,* 745 F.2d 1245, 1246 n. 2 (9th Cir.1984), but the record must support the finding that manifest necessity justified the mistrial, *Sanders,* 591 F.2d at 1299.

Regarding the final factor, whether the court's action was taken to benefit the defendants, Bates and Archer emphasize that the trial court was motivated not by concern for them but by desire to punish the prosecutor. There is considerable support for this in the record. On the other hand, the trial court's opinion cites the court's concern that juror bias may have resulted. The defendants, given a choice, might have elected to agree to the mistrial and to take a second chance with another trial since the evidence was overwhelming. On the other hand, the defendants may very well have wanted the trial to continue since the evidence could have been even more overwhelming in a second trial. Testimony of three government witnesses, though minor, had been struck in the first trial, and Silva definitely would not have misstepped in giving her testimony a second time. What the record shows, however, was that at the first opportunity given them to express their position, the defendants claimed that they wanted the trial to continue. The whole purpose of the double jeopardy clause is to ensure that defendants need not go through the trouble and anxiety of a second trial without their consent unless manifest necessity requires it.

Although this fourth factor less clearly favors the defendants, the other factors strongly suggest that the trial court abused its discretion.

## CONCLUSION

■■■ The evidence was overwhelming that Bates and Archer committed armed robbery. The prosecutor did little if anything wrong. The protections of the double jeopardy clause, however, do not turn on defendants' guilt, nor necessarily on prosecutors' bad or good behavior. The clause protects against a second trial for the same offense without good reason.

We can only speculate on the court's reasons for declaring a mistrial so suddenly. The officer's testimony that prompted the mistrial would not have led to certain reversal. The record demonstrates that just a little time and a few questions would have revealed that the fear of juror bias was unfounded. The record as a whole examined in light of the appropriate factors persuades us that the judge abused his discretion in declaring the mistrial. Because the defendants did not consent and manifest necessity did not justify the mistrial, the double jeopardy clause bars retrial. We reverse the trial court and remand for dismissal of the indictment with prejudice.

CHOY, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the judge abused his discretion in declaring a mistrial. However, because I do not believe that the consequence of double jeopardy ineluctably follows from a finding that the trial judge abused his discretion, I respectfully dissent. Under the circumstances of this case, the defendants' right to have their trial completed by a particular tribunal does not outweigh the public interest in affording the prosecution one full and fair opportunity to present its case.

The irony in the majority's result is apparent. The defendants in an armed robbery trial have been immunized from prosecution because the trial judge was erroneously overprotective of their right to a fair trial. I do not think any Supreme Court or Ninth Circuit precedent compels us to swallow such a bitter pill in this case. Instead, a result allowing the Government to reprosecute follows from *Gori v. United States*, 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961), which, despite its somewhat ambiguous status, is the most applicable Supreme Court authority for this case.[1]

1. The status of *Gori* was left unclear by the Court's plurality decision in *United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971). In *Jorn*, the trial judge had declared a mistrial because he felt that certain witnesses had not been adequately informed of their right against self-incrimination. Justice Harlan, writing for a plurality, concluded that the judge's abuse of discretion in declaring the mistrial resulted in double jeopardy. The Court distinguished the case from *Gori* on the ground that the trial judge had been motivated by "the desire to protect the witnesses rather than the defendant." *Id.* 400 U.S. at 483, 91 S.Ct. at 556.

The Court in *Gori* was faced with a situation similar to ours, where an overzealous trial court declared a mistrial to protect the defendant. The Court held:

> Judicial wisdom counsels against anticipating hypothetical situations in which the the the discretion of the trial judge may be abused and so call for the safeguard of the Fifth Amendment—cases in which the defendant would be harassed by successive, oppressive, prosecutions, or in which a judge exercises his authority to help the prosecution, at a trial which is going badly, by affording it another more favorable opportunity to convict the accused. Suffice that we are unwilling, where it clearly appears that a mistrial has been granted in the sole interest of the defendant, to hold that its necessary consequence is to bar all retrial. It would hark back to the formalistic artificialities of seventeenth century criminal procedure so to confine our federal trial courts by compelling them to navigate a narrow compass between Scylla and Charybdis. We would not thus make them unduly hesitant conscientiously to exercise their most sensitive judgment— according to their own lights in the immediate exigencies of trial—for the more effective protection of the criminal accused.

*Id.* 367 U.S. at 369–70, 81 S.Ct. at 1526–27. Thus the Court refused to rule that the judge abused his discretion in declaring a mistrial.

In contrast, I agree that the judge below abused his discretion in declaring a mistrial. However, I do not think that double jeopardy follows from this ruling for the reasons underlying the Court's decision in *Gori*. The Court in *Gori* realized that the notion of abuse of discretion in and of itself is insufficient for purpose of double jeopardy analysis in cases of this sort. As Justice Stewart stated in his assessment of *Gori:*

> *Gori* established, I think correctly, that the simple phrase "abuse of discretion" is not enough in itself to resolve double jeopardy questions in cases of this kind. Whether or not there has been an "abuse of discretion" sufficient to bar retrial cannot be determined without reference to the purpose and the effect of the mistrial ruling. The real question is whether there has been an "abuse" of the trial process resulting in prejudice to the accused, by way of harassment or the like, such as to outweigh society's interest in the punishment of the crime.

*Jorn*, 400 U.S. at 492, 91 S.Ct. at 560 (Stewart, J., dissenting). Applying this reasoning to the facts of this case, I believe that "the circumstances under which the mistrial was declared did not involve 'abuse' of a kind to invoke the constitutional guarantee against double jeopardy." *Id.* at 493, 91 S.Ct. at 561.

The majority reasons as follows. Defendants neither expressly nor impliedly consented to the judge's *sua sponte* declaration of a mistrial, and would have objected if given a chance. This implicates one of the central protections of the Double Jeopardy Clause: the assurance that "the defendant retain primary control over the course to be followed in the event of [judicial or prosecutorial] error." *United States v. Dinitz*, 424 U.S. 600, 609, 96 S.Ct. 1075, 1080, 47 L.Ed.2d 267 (1976). Therefore, the "manifest necessity" test applies. Because the judge declared the mistrial when it was not manifestly necessary, the

In dictum, however, the plurality opinion criticized the approach in *Gori* of qualifying the abuse of discretion principle on the basis of which side benefited from the mistrial. *Jorn*, 400 U.S. at 483, 91 S.Ct. at 556. *See also United States v. Gentile*, 525 F.2d 252, 256–57 (2d Cir. 1975). In *Illinois v. Somerville*, however, the Court quoted *Gori* approvingly for the proposition that a trial judge retains broad discretion in declaring a mistrial, and cautioned against the application of "any mechanical formula" for determining the propriety of a mistrial declaration. *Illinois v. Somerville*, 410 U.S. 458, 462, 93 S.Ct. 1066, 1069, 35 L.Ed.2d 425 (1973).

The majority in this case asserts that *Jorn* resolved "the precise issue before us." Majority Opinion at n. 10. *Jorn*, however, unlike the case before us, did not involve a mistrial that had been declared on behalf of the defendant. The *Jorn* Court explicitly acknowledged this when it distinguished the case from *Gori*. *Gori*, and not *Jorn*, therefore, addressed the "precise issue" before us.

court abused its discretion, and double jeopardy bars retrial.

The majority's analysis follows the conventional approach applied to numerous double jeopardy questions. This approach, however, does not make sense when applied to the present situation. The majority is forced to characterize the defendants' non-consent to the mistrial declaration as akin to an objection, because the manifest necessity test is unable to distinguish cases where defendants had no opportunity to object to mistrial, but where mistrial was declared solely for their benefit, from cases involving mistrial declared not for the defendants' benefit and over their express objection.

While I disagree with the majority's position that defendants would have objected if given the opportunity, like the majority I am not willing to imply consent to the mistrial in this case. This case simply does not fall into either the category of cases where defendant consented to the mistrial (and hence manifest necessity is not required to allow retrial), or the category of cases where defendant objected (and hence manifest necessity must be shown to allow retrial).

Rather than attempt to categorize this case, I would balance competing considerations in the manner proposed by Justice Stewart in his dissent in *Jorn*. Thus, I would weigh all the relevant considerations to see whether there has been an abuse of the trial process resulting in prejudice to the accused such as to outweigh society's interest in the punishment of the crime. *Jorn*, 400 U.S. at 492, 91 S.Ct. at 560 (Stewart, J., dissenting).

Applying this approach to the record in this case, it seems clear that a retrial would not violate the defendants' constitutional rights. The judge clearly declared the mistrial for the benefit of the defendants, because he believed the prosecutor's conduct resulted in irreparable prejudice to them.

Up to the point of the mistrial declaration, as the majority concedes, the Government's case was going quite well. Thus I disagree with the majority that the record is inconclusive on the issue of whether the court's action was taken to benefit the defendants.[2]

It is true that defendants had no opportunity to object or consent to the mistrial, thus implicating the important concern that the defendants be allowed to "retain primary concern over the course to be followed in the event of [judicial or prosecutorial] error." *Dinitz*, 424 U.S. at 609, 96 S.Ct. at 1080. But the harm to defendants in this case is less than where a defendant expressly wishes to proceed with the present tribunal. Here, the record indicates that the defendants up until their appeal thought that the judge acted properly; indeed, they felt that he should have dismissed the case because of the prosecution's conduct. Thus, while the trial court did take control of the case away from the defendants when the prosecutor supposedly erred, there is nothing to indicate that the defendants wanted to follow a different course than that taken by the judge.

I agree with the majority that the judge overreacted to the inadvertent error made by the prosecution (or its witness), and that he should not have declared a mistrial. There is no showing, however, of an intent on the part of the judge or the prosecutor to harass the defendants, or to enhance the chances of conviction in a second trial. As in *Gori*, the defense was given a preview of much of the prosecution's case, and had not yet revealed its own hand, thus minimizing the risk that the Government would gain an unfair advantage in the event of retrial. After considering all these factors, it is my view that even though the judge's action was improper by any standard of good trial practice, "the circumstances under which the mistrial was declared did not involve 'abuse' of a kind to invoke the constitution-

---

**2.** I do not see how the evidence could have been more overwhelming on retrial or why Silva's misstep while testifying made it less likely the jury would convict, as the majority suggests. Unfounded speculation about how strong the Government's case might be on retrial seems unnecessary to determine whether the court's action was taken to benefit (or had the effect of benefitting) the defendants. Further, it is my view that this benefit analysis is irrelevant to determining whether the trial court abused its discretion.

al guarantee against double jeopardy." *Jorn*, 400 U.S. at 493, 91 S.Ct. at 561 (Stewart, J., dissenting).

I would not remand for dismissal of the indictment.